# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KAREN RHODES, | * | |
|     Plaintiff, | * | |
| v. | * | Civil Action No. 8:19-cv-01463-PX |
| PARKLANE APARTMENTS, LLC, *et al*, | * | |
|     Defendants. | * | |

***

## MEMORANDUM OPINION

Pending before the Court is Defendants Fairfield Parklane, L.P., and Fairfield Residential Company, LLC's motion to dismiss for failure to state a claim. ECF No. 21.[1] The issues are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the reasons that follow, Defendants' motion is granted in part.

### I.    Background[2]

This housing discrimination case arises from Rhodes' souring relationship with Defendants (collectively "Fairfield"), who owned and managed Rhodes' apartment building for her 16 years of residency. ECF No. 14 ¶¶ 7–8, 10, 13. Rhodes, whose only source of income was Social Security Income ("SSI") and Social Security Disability Income ("SSDI"), relied on Montgomery County's Housing Opportunity Commission ("HOC") vouchers to pay her rent. *Id.* ¶¶ 15–16. As of April 2016, Rhodes' rent was $865 per month, all of which was covered by the

---

[1] Defendants have also filed a motion to dismiss Rhodes' Amended Complaint. ECF No. 9. Because Rhodes has filed a Second Amended Complaint without opposition, the Court will treat Second Amended Complaint as operative and deny Defendants' first motion to dismiss as moot.

[2] For purposes of this Opinion, the Court accepts the facts pleaded in the Amended Complaint as true and construes them most favorably to Rhodes. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

HOC voucher. *Id.* ¶¶ 26, 29. Fairfield knew that Rhodes used an HOC voucher and was aware of her approximate SSI and SSDI income. *Id.* ¶¶ 16–17.

In February of 2015, Rhodes underwent "lateral ankle replacement surgery," that required her to use a cane and wear a cast. *Id.* ¶ 18. After the surgery, Rhodes would often stand outside her apartment and wait for routine rides. *Id.* ¶ 19. Although Rhodes asked Fairfield for permission to sit on a retaining wall outside of her apartment, Fairfield denied this request on October 8, 2015 because it "looks bad." *Id.* ¶ 20. While Rhodes was waiting for her ride to the hospital six days later, a Fairfield employee again told Rhodes that she could not sit on this retaining wall. *Id.* ¶ 21. Then once more in March 2016, Fairfield's property manager, Nell Shaughney "screamed at" Rhodes and told her not to sit on the wall. *Id.* ¶ 22.

Following the incident with Shaughney, Rhodes contacted Montgomery County HOC employee, Rebecca Grayson. *Id.* ¶ 23. Grayson in turn contacted Shaughney, and then on April 1, 2016 visited Rhodes at her home. *Id.* ¶¶ 23–24. Together, Rhodes and Grayson wrote and submitted a "letter of accommodation" and enclosed medical documentation about Rhodes' "severe back problems that substantially limited her ability to walk, stand, and lift." *Id.* ¶¶ 24–25.

Rhodes avers that "[i]n April 2016, shortly after submitting accommodation request," Fairfield asked HOC for permission to raise Rhodes' rent from $865 per month to $1400 per month. *Id.* ¶ 26. HOC approved an increase, although only to $1245 per month, and Rhodes received official notice of this increase on August 31, 2016. *Id.* ¶¶ 26, 33. With the additional rent plus utilities, Rhodes became responsible for $1332 per month of housing expenses, which required her to pay out of pocket $122 not covered by the HOC voucher.[3] *Id.* ¶¶ 29, 33. This

---

[3] Rhodes alleges that her HOC voucher had a "payment standard of $1330." ECF No. 14 ¶ 28. Rhodes does not explain why she was required to pay $122 per month from her own income when the voucher apparently

2

increase came as a surprise to Rhodes, who thought her rent could not be increased to more than $875 per month because her home was part of a Low Income Housing Tax Credit property that was rent restricted. *Id.* ¶ 27.

Other residents did not experience such dramatic increases in rent. The rent for a unit next to Rhodes increased two dollars, from $1243 to $1245 for occupants with higher incomes than Rhodes. *Id.* ¶ 30. In general, Fairfield residents who used HOC vouchers experienced rent increases greater than those with similar units who did not use HOC vouchers. *Id.* ¶ 31. This is true although Rhodes found internet advertisements where Fairfield offered similar units to hers for as little as $875 per month. *Id.* ¶ 34.

On December 2 and again on December 12, 2016, Rhodes filed complaints of discrimination against Fairfield with the federal Department of Housing and Urban Development ("HUD"). *Id.* ¶¶ 36–37. Then on June 1, 2017, Fairfield again raised Rhodes' rent, this time to $1394 per month. *Id.* ¶ 38. Rhodes avers that this increase was greater than the 10% annual rent increase allowed by Maryland law. *Id.* After Rhodes again "complained of discriminatory leasing practices," Fairfield lowered Rhodes' rent to $1352 per month. *Id.* ¶ 39. To cover this rent increase, Rhodes was required to pay $183 per month of her SSI and SSDI income. *Id.* ¶ 43. During this time, a resident who lived in a similar unit but did not use HOC vouchers only saw a monthly increase from $1245 to $1270. *Id.* ¶ 41.

Rhodes filed another complaint of discrimination on December 22, 2017, this time alleging discrimination based on income under Montgomery County law. *Id.* ¶ 42. In October 2018, Fairfield raised Rhodes' rent to $1485 per month. *Id.* ¶ 43. Rhodes had to use $221 per month of her own income to cover this increase. *Id.* Again, non-voucher holders saw a lesser

---

covered all but $2 of her housing expenses. *Id.* ¶¶ 28, 33.

3

increase in rent. *Id.* ¶ 44. Rhodes cites, for example, a non-voucher unit identical to hers that only experienced an increase in rent from $900 to $960 per month, and another who experienced an increase from $1270 to $1395 per month. *Id.* ¶¶ 44–45. Because of the increases in rent, Rhodes moved to Pennsylvania "to find affordable housing and a unit suitable for her medical needs." *Id.* ¶ 46.

On April 11, 2019, Rhodes filed suit against Fairfield in the Circuit Court for Montgomery County, *see* ECF No. 2-1 at 1, alleging that Fairfield retaliated and discriminated against her in violation the FHA, Maryland state law, and Montgomery County law, ECF No. 3 ¶¶ 44–52. More particularly, Rhodes asserts that Fairfield "retaliated against [her]" because of her "request for reasonable accommodation and complaints of discrimination." *Id.* ¶¶ 44–46. Additionally, Rhodes contends that Fairfield "unlawfully discriminated against [her] because of her income" in contravention of Montgomery County law. *Id.* ¶¶ 47–49. Finally, Rhodes claimed that Fairfield engaged in "[r]etaliatory [h]arassment" against Rhodes, again "because of her complaints of discrimination and requests for accommodation," thereby violating the FHA, state, and county law. *Id.* ¶¶ 50–52.

Fairfield noted removal to this Court and then moved to dismiss for failure to state a claim. ECF Nos. 1, 9, 10. Rhodes responded by filing a Second Amended Complaint,[4] that removed Parklane Apartments, LLC as a party and added Fairfield Parklane, L.P. (a subsidiary of Fairfield Residential Company) and also clarified the statutory authority for her claims. ECF No. 18 ¶¶ 4, 8, 11–12, 49 n.4. The factual allegations remained unchanged. Fairfield now moves to dismiss Rhodes' Second Amended Complaint. ECF No. 22.

---

[4] Rhodes filed her original Complaint and Amended Complaint prior to Fairfield noting removal. *See* ECF No. 3 at 1 & n.1.

## II. Standard of Review

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint must satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). In other words, there must be sufficient factual allegations to render the plaintiff's claims facially plausible, or to permit reasonable inference that the defendant is liable for the alleged misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## III. Analysis

Fairfield moves to dismiss the entirety of her Second Amended Complaint. The Court assesses the sufficiency of each of Rhodes' claims.

### A. Retaliation

The Court begins with Rhodes' allegation of retaliation. The FHA prohibits retaliation in response to certain protected activities, providing that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. These protected activities include

formally complaining about discriminatory conduct, *see Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016), or requesting a reasonable accommodation for a disability, *see* 42 U.S.C. § 3604(f); *Wilson v. Wilder Balter Partners, Inc.*, No. 13–CV–2595 (KMK), 2015 WL 685194, at *8 (S.D.N.Y. Feb. 17, 2015); *Chavez v. Aber*, 122 F. Supp. 3d 581, 599–600 (W.D. Tex. 2015).

Maryland law prohibits retaliation using almost identical language to the FHA. Md. Code Ann., State Gov't § 20-708(1)–(2). Montgomery County's fair housing law forbids retaliation for "lawfully opposing any discriminatory practice" or "filing a complaint, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing" as provided for under county law. Montgomery Cty. Code, Ch. 27, Art. I, § 27-12(g). When local laws such as these bear such striking resemblance to the FHA, the Court applies the same pleading standards. *See, e.g.*, *Hall v. Greystar Mgmt. Servs., L.P.*, No. JKB–13–3613, 2014 WL 4977670, *5 (D. Md. Oct. 1, 2014), *rev'd on other grounds*, 637 F. App'x 93 (4th Cir. 2016) (dismissing FHA and state law retaliation claims for the same reason due to "nearly identical language").

To prove a fair housing retaliation claim, a plaintiff must establish that: (1) she was engaged in a protected activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *Hall*, 637 F. App'x at 98; *see also Matrarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 441 (E.D. Va. 2011), *vacated on other grounds sub nom.*, *Matarese v. Archstone Communities*, 468 F. App'x 283 (4th Cir. 2012) (*per curiam*). Where the protected activity and adverse action occur close in time, the court may infer the two are causally connected. *Hall*, 637 F. App'x at 99. In the Title VII context, which courts often draw from

6

when interpreting the FHA, *id.* at 98, "evidence of recurring retaliatory animus" may also demonstrate a causal link, *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Fairfield presents the Court with four scattershot arguments for dismissal. Fairfield contends that Rhodes' Second Amended Complaint is insufficient because she did not aver facts supporting (1) the causal connection between adverse action and protected activities, ECF No. 22 at 6, (2) Fairfield's "intent . . . to discriminate," *id.* at 7, (3) adverse action, *id.* at 5–6, or (4) the statutory authority for her protected activity, *id.* at 5. None of these arguments are persuasive.

First regarding the sufficiency of causation as pleaded, Rhodes' requested an accommodation for her recent ankle surgery to sit on the wall waiting for her transportation. This request not only provoked the ire of Fairfield employees, Rhodes also saw her rent double within the same month. *Hall*, 637 F. App'x at 99. Rhodes also pleads "evidence of recurring retaliatory animus" in that Fairfield continued to raise Rhodes' rent to the point where she was forced to leave her home of 16 years. *Lettieri*, 478 F.3d at 650. As pleaded, Rhodes' retaliation claim survives challenge.

Fairfield next repackages its causation argument and contends that the Second Amended Complaint does not sufficiently allege that Fairfield acted with "discriminatory intent." ECF No. 22 at 5, 7. This contention amounts to semantics. As already stated, Rhodes alleges facts that aver plausibly a causal link between her protected activities and Fairfield raising her rent. This showing is clearly sufficient. *See Hall*, 637 F. App'x at 98 (not requiring a specific allegation of "discriminatory intent").

Fairfield also urges that Rhodes' claim fails because she has not plead "how Fairfield . . . allegedly discriminated against her." ECF No. 22 at 5; *see also id.* at 6 ("Plaintiff has not averred facts in the Second Amended Complaint to put Defendants on notice of what 'adverse action' they took against her."). This argument flatly fails when reading the Second Amended Complaint which

7

lays out in detail Fairfield's retaliation through significant and steady rent increases that, in the end, nearly doubled her rent over a short timeframe, from $865 to $1485 per month. Fairfield's suggestion that the Amended Complaint does not provide "notice as to what claims are actually being asserted," *Id.* at 5, appears disingenuous when compared to the particularized allegations in the Amended Complaint. To the extent that Fairfield contends that raising Rhodes' rent is not an "adverse action" because it does not involve a "pattern of harassment," *Id.* at 6, the Court again disagrees. Raising a tenant's rent—particularly to the point where the tenant must move—may constitute a retaliatory adverse action that gives rise to relief. *Matrarese*, 795 F. Supp. 2d at 443.

Finally, Rhodes asserts that the Second Amended Complaint is deficient because it does not state "under which subsection of the FHA she has a protected right." ECF No. 22 at 5. Fairfield points to no authority to support this argument, likely because none exists. *See Gedrich v. Fairfax Cty. Dep't of Family Srvs.*, 282 F. Supp. 2d 439, 459 (E.D. Va. 2003); *P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, LLC*, No. 04–4554 (JAG), 2007 WL708978, at *8 (D. N.J. Mar. 5, 2007) ("The notice-pleading standard of Rule 8(a)(2) does not require that a plaintiff plead specific subsections of a statute he or she claims has been violated."). Rhodes specifies that her protected activities were her request for accommodation and subsequent complaints, which the Second Amended Complaint lays out in full factual detail. The Amended Complaint in this respect alleges comfortably a plausible claim for relief. The motion to dismiss is denied as to this count.

### B. Income Discrimination

Likewise, the Court concludes that Rhodes successfully states an income discrimination claim under the pertinent county statutory authority. The Montgomery County code provides that "[a] person must not, because of . . . source of income . . . discriminate in the . . . terms, conditions, privileges, or tenure of occupancy of any person." Montgomery Cty. Code, Ch. 27,

8

Art. I, § 27-12(a)(5). "Source of income" means "any lawful source of money, paid directly or indirectly to a renter or buyer of housing, including income from . . . any government or private assistance, grant, or loan program." *Id.* § 27-6. Thus, as the Maryland Court of Appeals has recognized, discrimination based on "source of income" includes receipt of housing vouchers. *See Montgomery Cty v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Ctr.*, 402 Md. 250, 265 (2007) (holding that § 27-12 reaches discrimination based on the receipt of Section 8 vouchers).

Fairfield argues that because the Montgomery County code "does not identify any prohibition on raising a tenant's rent" Rhodes' basis for relief is legally insufficient. ECF No. 22 at 13. The Court disagrees. The plain language of the pertinent code prohibits discriminatorily raising a person's rent, as rental payments are among the most important "terms [and] conditions . . . of occupancy." Montgomery Cty. Code, Ch. 27, Art. I, § 27-12(a)(5). Similarly, the Court may plausibly infer that Fairfield's rent hikes interfered with Rhodes "tenure of occupancy" in that she was forced the tenant to move. The Second Amended Complaint also establishes that Fairfield, aware of Rhodes' HOC voucher status, subjected her and other voucher recipients to steeper increases in their rents than non-voucher holders. ECF No. 14 ¶¶ 16, 30–31, 41, 44–45. Accepting these facts as true and most favorably to Rhodes, the plausible conclusion is that Fairfield discriminated against Rhodes within the purview of the Montgomery County code. Montgomery Cty. Code, Ch. 27, Art. I, § 27-12(a)(5); *Montgomery Cty*, 402 Md. at 265.

**C. Hostile Environment**

Finally, the Court turns to Rhodes' allegation that Fairfield violated federal, state, and county housing laws by subjecting her to a hostile environment in retaliation for her protected activities. Although "hostile work environment" actions are commonplace in the employment

9

context, *see, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 24 (1993), they are less so in the fair housing arena. The United States Court of Appeals for the Fourth Circuit has not directly considered whether a landlord or property manager may be liable for the kind of harassment Rhodes attempts to plead. The Fourth Circuit has recognized, however, that Title VII and Title VIII share the same central "anti-discrimination objectives" and has treated the two statutes without meaningful distinction. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982).

Mindful of the similarity of Title VII and Title VIII, this Court has previously held that the hostile-environment theory of discrimination that courts have developed in the Title VII employment context also applies in FHA actions. *See e.g., Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 494 (D. Md. 1996). HUD also recently promulgated regulations that expressly makes actionable any "hostile environment harassment" motivated by "race, color, religion, sex, familial status, national origin or handicap" and that is sufficiently severe or pervasive as to interfere with [the] . . . rental . . . of a dwelling." 24 C.F.R. § 100.600. With this clearly recognized cause of action in mind, the Court turns to Rhodes claims.

Fairfield first argues that Rhodes cannot advance a "retaliation" hostile environment claim because "retaliation" is not an enumerated protection under the regulation. ECF No. 22 at 9; *cf. Clarke v. DynCorp Intern., LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (recognizing a "hybrid" claim where an employer retaliates against an employee by creating a hostile work environment). Fairfield also argues that a state or county hostile environment analogue are simply not available to Rhodes. ECF No. 22 at 12, 14. Finally, and in the alternative, Fairfield contends Rhodes' hostile environment claims must be dismissed because Rhodes does not plead sufficiently "severe or pervasive" conduct. *Id.* at 10.

Fairfield's first two arguments implicate unsettled questions of law.[5] However, because Fairfield prevails on its final argument—that, even if these claims are available as a matter of law, the alleged conduct as pleaded is not sufficiently "severe or pervasive" to state a claim. Thus, the Court concentrates only on Fairfield's sufficiency argument.

At a minimum, to survive challenge, Rhodes must aver sufficient facts by which this Court could infer "unwelcome conduct that is sufficiently severe or pervasive." 24 C.F.R. § 100.600(a)(2). This conduct must "interfere with" her rental terms or the "use and enjoyment" of her residency. *Id.* In assessing the sufficiency of this claim, the Court looks to the nature, context, severity, scope, frequency, duration, and location of the incidents in question as experienced by a "reasonable person in the aggrieved person's position." *Id.* § 100.600(a)(2)(i)(A), (C). In the closely related hostile work environment context, "isolated incidents" do give rise to a claim unless "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Rhodes contends that the claim as stated is sufficient because she pleads that Fairfield did not allow her to sit on its retaining wall and significantly raised her rent. ECF No. 25 at 13–14. Even accepting these facts as true and most favorably to Rhodes, the Court cannot conclude as a matter of law that these incidents created a "severe and pervasive" hostile environment. The occasion when a Fairfield employee "screamed" at Rhodes for sitting on the wall was an "isolated incident," *Faragher*, 524 U.S. at 778, and not so severe and pervasive to have created a hostile environment that interfered with the "use or enjoyment" of her apartment," 24 C.F.R. §

---

[5] It is less than obvious whether the FHA and its attendant regulations authorize "hybrid" claims that address hostile environments created in retaliation for protected activity. *See* 24 C.F.R. § 100.600(a) (forbidding hostile environment harassment "because of race, color, religion, sex, familial status, national origin or handicap" but not addressing retaliation for prior protected activity); *but see* 42 U.S.C. § 3617 (forbidding retaliatory "coerc[ion], intimidat[ion], threat[s], or interfer[ence]" on the basis of prior protected activity).

100.600(a)(2). Furthermore, Rhodes offers no authority that raising the rent, without more, can give rise to a hostile environment claim. This is especially so when considering that other FHA provisions cover raising the rent as an act of discrimination. *See, e.g.*, 42 U.S.C. § 3604(b), (f)(2). Thus, the facts as pleaded simply do not make out a hostile environment claim.

This conclusion applies with equal force to Rhodes' hostile environment claims under Maryland and Montgomery County law. Rhodes appears to agree that any such claim would share "parallel methods of proof" with FHA hostile environment claims. ECF No. 25 at 15–16. The lack of "severe and pervasive" conduct is therefore equally fatal of these state and local law causes of action. As such, Rhodes does not state a hostile environment claim under any statutory authority and this count of her Second Amended Complaint must be dismissed.

That said, the Court will not dismiss Rhodes' hostile environment claims with prejudice. If in discovery Rhodes generates sufficient facts to show she was the victim of such "severe or pervasive" conduct separate from the mere raising of rent, Rhodes may move to amend the Complaint with a more robust factual record. In a forthcoming scheduling order, the Court will set a deadline by which the parties shall amend pleadings.

## IV.     Conclusion

Based on the foregoing, the Defendants' motion to dismiss is granted in part. A separate Order follows.

 \_12/27/2019_____           _____/s/_____
Date                                                                          Paula Xinis
                                                                                      United States District Judge